### In re WILLIAM HILL & SONS.

(District Court, E. D. Pennsylvania. April 19, 1911.)

No. 3,151.

1. EVIDENCE (§ 461*)—TESTIMONY AFFECTING WRITINGS—ADMISSIBILITY.

Under an agreement, in a note secured by collateral, that the securities should be applicable to any other obligation held by the payee, parol evidence offered by the payee is not admissible to show that the parties understood that the collateral was to cover the debts of the pledgor's firm.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 2129–2133; Dec. Dig. § 461.*]

2. PARTNERSHIP (§ 187*)—PLEDGES—APPLICATION OF COLLATERAL.

An agreement, in a note secured by collateral, that the securities should be applicable to any other obligation held by the payee, entitles the payee to apply surplus proceeds of the collateral to an obligation of a firm of which the maker is a partner.

[Ed. Note.—For other cases, see Partnership, Cent. Dig. §§ 340, 342; Dec. Dig. § 187.*]

In the matter of William Hill & Sons, bankrupts. On review of an order of Referee Alfred Driver on a claim to surplus funds. Affirmed.

George J. Edwards, Jr., and John E. Sibble, for trustee.
William S. Furst, for Southwark Nat. Bank.

J. B. McPHERSON, District Judge. William Hill was a member of the bankrupt firm. Since March, 1896, the firm had been a depositor and borrower in the Southwark National Bank, and owed the bank about $10,000 when the petition was filed. William Hill individually had also been a depositor and borrower; his separate transactions beginning in November, 1904. When the petition was filed his individual debt was $4,800, and for this sum the bank held certain stock and

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

two policies of life insurance as collateral security. The stock has been sold and the proceeds properly applied. The policies have a known surrender value of $2,400, and this is about $1,600 more than enough to pay the balance due. Who is entitled to this surplus? The trustee of Hill's individual estate claims it, and the bank also claims it on account of the firm's indebtedness. The bank's position is based upon these facts: When Hill borrowed from the bank in 1904, and whenever the note was afterwards renewed, he signed the printed form commonly used by the bank, which contained, inter alia, the following clause:

"And it is further agreed that the securities hereby pledged, together with any that may be pledged hereafter, shall be applicable in like manner to secure the payment of any past or of any future obligations held by the holders of these obligations, and all of the securities so pledged and in their hands shall stand as one general continuing collateral security for the whole of the obligations of the undersigned, so that the deficiency on any one shall be made good from the collaterals for the rest."

[1] Other evidence was offered—a declaration of Hill, and some testimony given by the president of the bank—to the effect that Hill and the bank understood that the collateral was to cover the debts of the firm, as well as Hill's individual debt; but I give it no weight. In my opinion, nothing in the case takes it out of the general rule that the meaning of a written agreement is to be drawn from its own language, read in the light of the transaction and the situation of the parties. I therefore exclude the evidence in favor of the bank as I should be disposed to exclude evidence against the bank.

[2] The situation briefly was this:

The firm of which Hill was a member was already indebted to the bank upon partnership notes—or, if not actually so indebted at the precise date in November, 1904, was at all events a business customer, and was likely to become so indebted at any time in the usual course of affairs. Upon such notes Hill was already liable as a partner, or would be so liable whenever they should be given. He desired accommodation for an individual purpose, and gave an individual note, securing it by the collateral in question. What did the parties mean by the foregoing clause? To my mind they meant what they seem to say: All the collateral is to stand as a general continuing security to protect the bank against "the whole of the obligations" of William Hill, and is to be applied to his past, as well as to his future, obligations. On its face the clause applies, not only to an obligation upon which he would be liable as an individual, but also to an obligation upon which he would be liable as a member of the firm. Both are alike his "obligations," and I find nothing in the circumstances of the transaction or in the situation of the parties to justify a restriction of the natural and ordinary sense borne by the language of the clause. To one kind of obligation, already in existence, he thus adds another kind, and pledges the securities to protect both.

A similar result has been reached in Massachusetts. Hallowell v. Blackstone Bank, 154 Mass. 359, 28 N. E. 281, 13 L. R. A. 315. There the language of the individual note was:

"On the nonperformance of these terms, said bank applying the net proceeds to the payment of this note and accounting to me for the surplus, if any; and it is hereby agreed that such surplus, or any excess of collaterals upon this note, shall be applicable to any other note or claim against me held by said bank."

This was held to justify the application of a surplus to a previous obligation of the firm, although the collateral had been pledged primarily to secure an individual debt—the court saying:

"The question remains whether the bank is entitled to hold the security for the bills which were accepted by Smith's firm, and not by him individually. It cannot be denied that the acceptances were 'claims against him,' or that the words used in his note were broad enough to embrace firm acceptances, unless there is some reason in the context, the circumstances, or mercantile practice, to give them a narrower meaning. Singer Manuf. Co. v. Allen, 122 Mass. 467; Chuck v. Freen, Mood. & Malk. 259. If Smith had had private dealings and a private account with the bank as a depositor, and his firm also had had dealings and an account there, and Smith had given security in the terms of his note in order to be allowed to overdraw or to obtain a discount, it may be that the generality of the language would be restrained to the line of dealings in the course of which it is used. Ex parte McKenna (City Bank Case) 3 De G., F. & J. 629. See Lindl. Part. (5th Ed.) 119, and note. But we are called to construe a printed form used by the bank, and presented by it for those who borrow from it to sign. The question is: What is the reasonable interpretation of such words, when insisted on as a general formula to be used by would-be borrowers, irrespective of any special course of business of the particular person who signs it, which, for the matter of that, there does not appear to have been in this case. For all that appears, the note mentioned may have been the only transaction that ever took place between the defendant and the plaintiff's insolvent alone. The printed form, it may be assumed, would have been used by the bank equally in a case where the borrower was the principal man in his firm and the only one known to the bank, was borrowing for his firm daily, and had never borrowed for himself but in this instance, and in a case where the borrower's membership in a firm whose notes the bank held was unknown. This being so, in the opinion of a majority of the court there is no sufficient reason for not giving the words their full legal effect. The clause pledging the property for any other claims against the debtor is not inserted with a view to certain specific debts, but as a drag-net to make sure that whatever comes to the creditor's hands shall be held by the latter until its claims are satisfied. Cory on Accounts and Lindley on Partnership have made it popular to refer to a mercantile distinction between the firm and its members. But we have no doubt that our merchants are perfectly aware that claims against their firms are claims against them, and when a merchant gives security for any claim against him, and there is nothing to cut down the literal meaning of the words, he must be taken to include claims against him as partner."

In New York there is an apparently opposing decision—Bank v. Thompson, 121 N. Y. 280, 24 N. E. 473—although it is possible to distinguish the cases upon the facts. Thompson individually borrowed from the bank, and secured the loan by a mortgage, conditioned, inter alia, to secure the payment of "all sums of money which now are or shall at any time be due or owing by him to said bank upon any account whatever." Several years afterwards he entered a partnership, and the firm also borrowed money from the bank. The court held that the mortgage did not cover the firm notes, saying:

"It is clear that, at the time of the execution of the mortgage, the parties did not contemplate any firm indebtedness, or any indebtedness of a firm of which Reynolds might be a member. The plaintiff was dealing with him individually, and it was obtaining security for his individual and personal obli-

gations, and a fair construction of the language shows that it was intended to secure such obligations and such only. The language is broad and general, and carefully framed, so as to make sure that all such obligations should be covered. In ordinary commercial language the obligation of a firm would not be spoken of as the obligation of any one of its members, and a firm is regarded as an entity distinguished from all the individual members of which it is composed. * .*. *. This mortgage must be regarded as a commercial instrument, executed in commercial transactions, and must be construed as ordinary commercial men would understand the language used; and we think that among business men a distinction is made between the firm as an entity and the members who compose it, and that this language would not be understood as broad enough to cover the indebtedness of a firm of which Thompson was a member, and for whose debts, jointly with the other members of the firm, he could be made responsible."

Without insisting on the distinction that may be drawn between these decisions, and regarding them as directly opposed, I prefer the ruling in Massachusetts. Special cases may no doubt arise where it may be proper to prove that the parties intended to cover only one class of obligations by a pledge that apparently covers other classes also; but (speaking generally) I perceive no satisfactory ground for restricting the plain, natural meaning of a commercial instrument in common use. The clause in question is ordinarily employed for the precise purpose of reaching all the debtor's pledged obligations, of every kind and whenever given; and, since the object is lawful, there seems to be no reason why as a general rule this ordinary business transaction should not be allowed to have its intended effect. Very recently the Court of Appeals of the Third Circuit—Soisson v. Bank, 181 Fed. 641, 104 C. C. A. 371—declined to permit a similar instrument to be varied by parol testimony. But here there is no parol testimony to vary it, or attempt to vary it; and the only ground for seeking to restrict it is the argument, supported by one decision, that a written instrument should be construed to mean something else than the parties themselves have agreed upon. This is a dangerous field to enter upon, especially in the absence of testimony to support the experiment. If the New York case is allowed to stand upon its own facts, the argument has very little to recommend it.

The referee's order was right, and is affirmed; but it is now modified, so that the period allowed by him shall extend to and include May 1, 1911.